Howard W. GAULT and Georgiana R.
Gault, Petitioners,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 351, Docket 28539.

United States Court of Appeals
Second Circuit.

Argued March 12, 1964.

Decided May 25, 1964.

———◇———

Herbert L. Cohen, Bridgeport, Conn.
(Robert J. Ashkins, and Cohen & Wolf,
Bridgeport, Conn., on the brief), for pe-
titioners.

Edward B. Greensfelder, Jr., Attorney,
Dept. of Justice, Washington, D. C.
(Louis F. Oberdorfer, Asst. Atty. Gen.,
Lee A. Jackson and David O. Walter,
Dept. of Justice, Washington, D. C., on
the brief), for respondent.

Before LUMBARD, Chief Judge, SMITH, Circuit Judge and LEVET, District Judge.*

J. JOSEPH SMITH, Circuit Judge.

This case presents the frequently recurring issue of whether gains realized from the piecemeal sale of subdivided real estate should be taxed as capital gains or ordinary income. The Commissioner denied capital gains treatment to income derived from petitioner's [1] sales of lots and assessed deficiencies of $9,836.51 and $19,447.15 in petitioner's respective 1957 and 1958 income tax returns. The Tax Court sustained the Commissioner, holding that the taxpayer's cumulative activities with respect to his real estate were sufficient to place him in the trade or business of selling real estate. We agree and affirm the Tax Court.

The petitioner is the president of L. H. Gault & Son, Inc., a corporation with a prosperous fuel oil, cement, and sand and gravel business in Westport, Connecticut and its environs. In January of 1950 he purchased for $50,000 a tract of 167.48 acres of undeveloped land in Westport.

Not long after acquiring the tract, the petitioner was approached by four neighbors who wished to purchase building lots for themselves. During the fall of 1950 the petitioner had part of the tract surveyed and platted, and four lots were sold to the neighbors. $675 was spent for the surveying and platting in 1950, while $1566 was spent that year for roads, drainage, and road oil. Petitioner renamed the tract Gault Park, and from time to time had additional areas platted, roads built, and water mains and fire hydrants installed. From 1950 to 1958 petitioner sold 68½ lots for substantial sums, and during this same period spent more than $52,000 to improve the tract.

Congress has specifically excluded "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" from the preferential tax treatment accorded capital gains. Section 1221(1) of the 1954 Internal Revenue Code, 26 U.S.C. § 1221 (1). By doing so, Congress intended to treat gains which it regarded as the everyday profits of the business and commercial world as ordinary income. The statute has thus presented the courts with the conceptually difficult problem of categorizing real estate as either held for investment or held for sale in a trade or business. In order for an investor to realize his investment, he must sell the property, and the sale of the investment typically partakes of the practices of the business and commercial world. See Surrey, Definitional Problems in Capital Gains Taxation, 69 Harv.L.Rev. 985, 990 (1956). Because there is a good deal of overlapping between business and investment property in this area, the cases are legion. "Indeed, the case law has grown to a jungle-like abundance accompanied by much of the welter and impenetrability which such fertility produces." Kelley v. Commissioner, 281 F.2d 527, 528 (9 Cir. 1960). See the cases collected in 3B Mertens Law of Federal Income Taxation §§ 22.138–22.141 (Zimet & Weiss Rev.). See also Weithorn, Subdivisions of Real Estate—"Dealer" v. "Investor" Problem, 11 Tax L.Rev. 157 (1956).

■ In enacting the 1954 Internal Revenue Code, Congress added § 1237 "to permit taxpayers qualifying under it to sell real estate from a single tract held for investment without the income being treated as ordinary income merely because of subdividing the tract or of active efforts to sell it." Reg. § 1.1237–1 (a) (1). But § 1237 is not exclusive, and where, as here, the taxpayer fails to meet

* Sitting by designation.

1. The petitioner Georgiana Gault was a housewife during all times relevant to this case. She neither worked for the Gault Corporation nor was otherwise engaged in any trade or business. She is listed in the caption of the case only because she signed a joint return with her husband Howard Gault. Hence, we have used the term "petitioner" or "taxpayer" in the singular to refer to Howard Gault.

the restrictive conditions of § 1237, the taxpayer may still show that his property was held not primarily for sale to customers but as an investment. Reg. § 1.1237-1(a) (4).

■ In drawing a rather wavering line between the investor in real estate and the dealer in real estate, the courts have resorted to multifactoral analyses, considering relevant such factors as: (1) the frequency, number, and continuity of the sales; (2) subdivision, platting, and other improvements or developments tending to make the property more marketable; (3) the extent to which the taxpayer engaged in sales activity; (4) the length of time the property has been held; (5) the substantiality of the income derived from the sales, and what percentage that is of the taxpayer's total income; (6) the nature of the taxpayer's business; (7) the taxpayer's purpose in acquiring and holding the property; (8) the extent of sales promotional activity such as advertising; and (9) the listing of property for sale directly or through brokers. See Kaltreider v. Commissioner, 255 F.2d 833, 838 (3 Cir. 1958); Friend v. Commissioner, 198 F.2d 285, 287 (10 Cir. 1952); Mertens, supra, § 22.138. No one of these factors is necessarily decisive, and some weigh more heavily than others. As Mertens correctly observes: "It is difficult to attach an absolute or specific degree of importance to the particular factors involved, and in part the' weight of any one factor has depended on the combination of others with which it occurred." § 22.138, n. 69, pp. 623, 624.

There is no real dispute about the underlying facts found by the Tax Court. On the one hand, it appears that the taxpayer was rather passive about the promotion of Gault Park. Sales were unsolicited; the taxpayer neither advertised nor hired any salesman. The property was not listed with any real estate broker, nor did the taxpayer hold himself out as a broker. He had a full time job managing a fuel oil business and devoted no more than two or three hours a week to his real estate. In 1957 his income totaled more than $85,000 with $23,000 of that amount derived from his real estate sales. In 1958 his income totaled about $109,000 with about $44,000 derived from his real estate sales.

On the other hand, sales began within seven months after the date of purchase. More than $52,000 was spent in improving the property from 1950 to 1958. Petitioner had it surveyed and platted, built roads, and installed mains and fire hydrants. Substantial amounts were realized from more or less continuous sales over the eight year period. During the two tax years in question, 20½ lots were sold for more than $67,000. The petitioner took an active interest in the development of the tract, rejecting proposed houses he considered too modern, and in general sought to ensure that Gault Park would develop into an exclusive residential area. While petitioner's motive in purchasing the tract is not too clear, his own testimony reveals that he regarded Gault Park as more than just an investment:

"Q. From your iron control over Gault Park, Mr. Gault, is it fair to say you purchased this tract of land with the purpose of dividing it or developing a high-class residential area? A. That is what I wanted to do, yes.

\* \* \* \* \* \*

"Q. [W]hat was your impulse, your purpose, when you made this purchase initially? A. When I bought it, I just didn't want to see this thing being cut up into a lot of small lots. Of course, it was [zoned] one acre, anyway. I was afraid that a lot of small homes would build up within a year's time. I just wanted to see this thing lay there and gradually develop. I didn't really know what I wanted to do right off the bat. Knowing what a piece of ground it was, I wanted to make something out of it.

\* \* \* \* \* \*

"Q. Actually, did you have any opportunities to sell it as a bulk? A. Yes, I could have sold it.

"Q. What was the problem in connection with that? A. I just didn't want to sell it because I was afraid these other folks wouldn't develop it the way I would like to see it."

We think the record amply supports the Tax Court's inference that this property was being held primarily for sale to customers, and that the petitioner's sales and other activities with regard to this tract were sufficiently frequent and continuous to categorize the petitioner as a dealer in real estate. Phipps v. Commissioner, 54 F.2d 469 (2 Cir. 1931), on which the taxpayer relies, is distinguishable on its facts. There New York residents bought Florida land, which they had surveyed, platted, and improved soon after its purchase. The lots were then sold through local brokers. During the tax years in question, the taxpayers' activity towards the lots was considered so minimal and the sales of lots by local brokers so infrequent that the gains from the sales were held to be capital gain. The holding of the Phipps case is today quite questionable, for it construed the statutory exclusion for business property narrowly. Unlike most statutory schemes, where exceptions from the general rule are to be narrowly construed, the statutory exclusions from the general definition of a capital asset are to be construed broadly to avoid frustrating Congressional intent to deny capital gains treatment to everyday business profits. Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 52, 76 S.Ct. 20, 100 L.Ed. 29 (1955); Kaltreider v. Commissioner, supra, 255 F.2d at 838. Where a taxpayer subdivides, spends a substantial sum improving the lots put up for sale, and realizes substantial sums through fairly regular sales, it is exceedingly difficult to escape the inference that the taxpayer has become a dealer in real estate.

The decision of the Tax Court is affirmed.